

FILED & ENTERED

JAN 12 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

|  |  |
|---|---|
| In re:<br><br>Kevan Harry Gilman,<br><br><br><br><br><br>Debtor. | Case No.: 1:11-bk-11603-VK<br><br>CHAPTER 7<br><br>**MEMORANDUM DECISION**<br><br>Date:    July 24-29, 2015<br>Time:   9:30 a.m.<br>Place:   Courtroom 301<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA 91367 |

On February 7, 2011, Kevan Harry Gilman ("Debtor") filed a voluntary chapter 7 petition. On August 4, 2011, Debtor filed his amended schedule C, in which he claimed an enhanced disability exemption in his homestead pursuant to Cal. Code of Civ. Proc. ("CCP") § 704.730 [doc. 35]. On July 17, 2012, Tammy R. Phillips and Tammy R. Phillips, a Prof. Law Corp. ("Creditors"), filed an objection to Debtor's claim of an enhanced disability homestead exemption (the "Objection") [doc. 73].[1]

---

[1] Previously, Creditors filed an objection to Debtor's general claim of a homestead exemption. The Court overruled that objection, and Creditors' appeal of that decision is currently pending. As such, the sole issue for determination at this time is whether Debtor is entitled to the disability enhancement set forth in CCP § 704.730(a)(3).

From July 24, 2015 to July 29, 2015, the Court conducted an evidentiary hearing for this matter.

For the reasons set forth below, the Court will sustain the Objection and enter a judgment for Creditors based upon the following findings of fact and conclusions of law made pursuant to Federal Rule of Civil Procedure 52(a), as incorporated into Federal Rules of Bankruptcy Procedure 7052 and 9014(c).

## I.    BACKGROUND

*A.    Debtor's Relevant Employment History*

### 1.    Pre-Petition Employment

Debtor has been a licensed and practicing attorney for over 30 years.[2]  Beginning in 1997, Debtor started a business called Lien Medical, at the time a sole proprietorship.  Exhibit 2.[3] Lien Medical targeted plaintiffs involved in personal injury or worker's compensation lawsuits who had no health insurance. *Id.*  Lien Medical would pay medical service providers to furnish treatment to the plaintiffs and then place a lien on the proceeds from the lawsuit.  Exhibit 5.  In 2001, Debtor incorporated Lien Medical, calling the business Lien Medical, Inc.  Exhibit 2.

From Debtor's operation of Lien Medical and Lien Medical, Inc. arose the dispute between Debtor and Creditors.  Eventually, Creditors obtained a judgment against Debtor, which Debtor scheduled in this bankruptcy case.  It is unclear when Debtor stopped operating Lien Medical, Inc.  However, as of March 2011 (postpetition), Debtor still represented himself to be a member of the Board of Directors of Lien Medical, Inc. *Id.*

Aside from being on the Board of Directors of Lien Medical, Inc., beginning in April 2009, Debtor was a partner at Triumvirate Associates ("Triumvirate"). *Id.*  Debtor spent about 1.5 hours per week working to connect companies with venture capital firms, intending to be compensated for making those connections.  As concerns his work with venture capital firms, Debtor testified that he was targeting larger scale projects.  For example, four months prior to the February 7, 2011 (the "Petition Date"), Debtor stated he was "looking for projects that need

---

[2] Unless otherwise indicated, all facts are derived from testimony at the evidentiary hearing.
[3] All exhibit citations refer to Creditors' exhibits admitted at the evidentiary hearing.

1   Venture Capital of at least $5 [million] U.S." Exhibit 9. Debtor continued to work in his role as
2   a partner at Triumvirate until after the Petition Date. Subsequently, he transitioned to working
3   for Venture-Net Partners ("Venture-Net").

4        While working for Triumvirate and Lien Medical, Inc., Debtor also was involved in
5   prosecuting at least one action in state court, namely, *Gilman v. Dalby*, No. 04 AS 03166
6   ("*Dalby*"). During the evidentiary hearing, Creditors presented evidence demonstrating Debtor's
7   involvement with *Dalby* before and after the Petition Date. In fact, one of the documents filed in
8   that case called for a hearing on the Petition Date itself. Exhibit 8. Debtor testified that he
9   intended to attend this hearing in his capacity as an attorney.

10       Debtor's prepetition involvement with *Dalby* is set forth below:

11   • On November 30, 2009, Debtor filed a *Substitution of Attorney* form. Exhibit 43.

12   • On December 8, 2009, Debtor wrote a letter stating that he would file a motion pursuant
13       to CCP § 908 if payment was not made to Lien Medical. Exhibit 44.

14   • On March 5, 2010, Debtor filed the CCP § 908 motion. Debtor prevailed on this motion
15       and eventually received payment as a result of his filing.

16   • On October 8, 2010, Debtor filed an objection to a motion to strike. Exhibit 7.

17   • As of December 29, 2010, Debtor's co-counsel, Adam Thiel, was officially disassociated
18       from the case. Exhibit 10.

19   • On December 30, 2010, Debtor filed a declaration. Exhibit 8. The caption of the
20       declaration called for a hearing on February 7, 2011, the Petition Date.[4]

21   • On January 29, 2011, Debtor wrote a five-page letter for the purpose of filing a civil
22       appellate mediation statement. Exhibit 10. The letter indicates that Debtor made a series
23       of calls to the court regarding the mediation. *Id.*[5]

24       Regarding the *Dalby* case, Debtor testified that colleagues occasionally helped prepare
25   some of the filings. Nevertheless, Debtor signed the *Dalby* filings admitted into evidence and/or
26   they originated from Debtor's office in Northridge, California. *See, e.g.* Exhibits 7, 8, 10, 43, 44.

27

28
---
[4] Debtor testified it took four hours to complete this declaration.
[5] Debtor testified it took him around four and a half hours to draft the letter, decide which exhibits were relevant to include and to attach the eight exhibits to the letter.

As of the Petition Date, Debtor was also involved in defending an appeal in *Phillips et al. v. Dalby*, No. C066930.   Exhibit 29.   Around this time, Debtor was working between one to six hours per week on the legal matters for which he was counsel of record.   Debtor charged an hourly rate of $350 to represent clients.   Debtor also was attempting to find work as an appearance attorney for a lesser rate.

### *2.  Post-Petition Employment*

Before and after the Petition Date, Debtor continued to be involved with his several business enterprises.   Debtor actively sought employment after the Petition Date.

As of March 13, 2011, a month after the Petition Date, a snapshot of Debtor's LinkedIn profile indicated he was a partner at Triumvirate, was on the Board of Directors of Lien Medical, Inc. and was a practicing attorney running his own law firm.   Exhibit 2.

At some point in 2011, through the connections he had established while working at Triumvirate, Debtor started working with Venture-Net.   Debtor testified that after working "a lot" for Venture-Net and referring several accounts to them, Venture-Net promoted Debtor to the position of "associate."

Aside from continuing his venture capital work, Debtor also continued to prosecute the *Dalby* matter.   For example, on May 31, 2011, Debtor drafted a declaration.   Exhibit 17.   Debtor testified that it took him about five to six hours to prepare the declaration. *Id*.   Debtor also testified that for the six month period post-petition, Debtor continued to speak to attorneys he knew in an attempt to work at a reduced rate as an appearance attorney.

In addition to *Dalby*, Debtor was also involved in a dispute with his health care insurer around this time.   By way of several demand letters, Debtor threatened legal action unless the health insurer authorized an open MRI for Debtor.

Debtor continues to work as an attorney.   In a deposition dated September 16, 2013, Debtor testified that he was representing multiple clients.   Debtor has never taken inactive status with the California State Bar.

Creditors also pointed to Debtor's involvement with the sale of his home.   Sometime in late 2010, Debtor and his wife attempted to sell their home and Debtor's condominium. Exhibit

11.  Debtor's broker handled most of the communications regarding title and liens.  However, Debtor did some legal research related to the sale of his home.  In December 2010, Debtor researched California Civil Code Section 2943, regarding payoff demands, and he communicated with the broker regarding the applicability of this statute.  *Id.*

Although the business was slowly winding down, on and after the Petition Date, Debtor also continued to work for Lien Medical, Inc.

**B.    *Debtor's Relevant Medical History***

**1.    *Depression and Anxiety***

During the evidentiary hearings, Debtor presented testimony from his primary care physician, Dr. Sikander Kajani.  According to Dr. Kajani, Debtor experienced mood changes "a couple of years after 2009" and had "family issues" relating to problems with Debtor's wife.  Dr. Kajani noted that Debtor was well dressed in earlier appointments, but later looked disheveled. Debtor was "tearful" and upset during one of his appointments.

On March 10, 2009, in response to Debtor's reported inability to concentrate and his fluctuating mood changes, Dr. Kajani made a referral for Debtor to see a psychiatrist and he offered to admit Debtor into a hospital.  Dr. Kajani stated he did not measure Debtor's capacity to work at that time.  Because he is not a psychiatrist, Dr. Kajani stated that he does not get involved with his patients' psychiatric issues.

Debtor began seeing a psychiatrist.  The psychiatrist placed Debtor on an antidepressant medication regimen.   Exhibit 22.  Initially, the medication did not help Debtor to focus because his "mind was racing from one thing to another." *Id*.  The psychiatrist increased the medication dosage until it started helping. *Id*.  In his declaration filed on July 24, 2012, Debtor stated that "the new anti-anxiety medicine worked." *Id.*

By January 19, 2011, Debtor's doctor noted that though Debtor had an episode of depression and anxiety in December 2010, Debtor was taking medication and his depression and anxiety issues were resolved.   Exhibit 37, p. 109.

### 2. Orthostatic Hypotension and Tinnitus

Debtor further bases his claim of disability on having orthostatic hypotension. Because of this condition, Debtor testified he would become lightheaded if he moved too quickly. The condition did not bother him when he was well hydrated. Although Debtor asserted he had orthostatic hypotension as of the Petition Date in February 2011, doctor's notes dated January 19, 2011 indicate that the "orthostatic hypotension [was] resolved." Exhibit 37, p. 109.

Debtor further stated that he was experiencing symptoms of tinnitus in his left ear. According to Dr. Kajani, on November 4, 2011, Debtor was checked for tinnitus. However, at the evidentiary hearing, Dr. Kajani testified that he did not find sufficient evidence to diagnose Debtor with tinnitus at that time.

In his deposition testimony taken on October 15, 2014, Debtor repeated that he "presently" has orthostatic hypotension and tinnitus. Exhibit 45.

### 3. Cancer

On October 2, 2009, Debtor was seen by an urologist, Dr. Peter Schulam, regarding a mass on his kidney. Exhibit 37, p. 9. Dr. Schulam determined that Debtor had two masses on his kidney and a cyst on the other end of his kidney. *Id*. The pathology report indicated the tumor was confined to the kidney. Exhibit 39.

On October 21, 2009, Debtor underwent surgery to remove the tumor in his kidney. Exhibit 38. After surgery, he began to get regularly tested for signs of cancer. *Id*. As such, between October 9, 2009 and August 30, 2013, Debtor underwent a series of 17 separate Fluorescence in Situ Hybrid ("FISH") tests in an attempt to detect cancer. *Id*. Debtor tested positive on the initial pre-operative exam, as well as two other instances within an eight-month period after surgery. *Id*. However, each FISH test performed between July 16, 2010 and August 30, 2012 resulted in a negative reading. As a result, Debtor stopped taking follow up exams. *Id*. The following is a list of Debtor's FISH tests with corresponding results:

| Test No. | Date | Result |
|----------|-----------|----------|
| 1 | 9/9/2009 | Positive |
| 2 | 10/6/2009 | Positive |

| 3 | 10/7/2009 | Positive |
| 4 | 10/9/2009 | Positive |
| **5** | **10/21/2009** | **Debtor Surgery** |
| 6 | 2/1/2010 | Insufficient Cells |
| 7 | 2/26/2010 | Negative |
| 8 | 5/14/2010 | Positive |
| 9 | 6/1/2010 | Positive |
| 10 | 7/16/2010 | Negative |
| 11 | 9/14/2010 | Negative |
| 12 | 3/7/2011 | Negative |
| 13 | 6/24/2011 | Negative |
| 14 | 6/27/2011 | Negative |
| 15 | 6/30/2011 | Insufficient Cells |
| 16 | 8/12/2011 | Negative |
| 17 | 8/30/2012 | Negative |

Exhibit 38.

Debtor testified that he continued to be concerned about his cancer recurring after the surgery. At some point after the nephrectomy, Debtor's doctors informed him that Debtor had a nodule in his upper right lung. Debtor testified that he worried the nodule was a sign of cancer.

After finding this nodule, Debtor consulted with an oncologist, Dr. J. Gary Davidson. Debtor underwent a PET scan of his chest, after which Dr. Davidson opined that "these things we are seeing in the chest are either artifacts or small old changes." Exhibit 40. Regarding the tumor in Debtor's kidney, Dr. Davidson further opined that "[i]t would be unlikely that a renal cell carcinoma so confined and so well circumscribed would be metastatic at this time." *Id*.

On June 22, 2010, Debtor requested more FISH tests to allay his fears of cancer. Exhibit 37, p. 115. The treating physician indicated that if the FISH results were positive they would recommend a cystoscopy as an additional test for cancer. *Id*.

In her Followup Note dated September 1, 2010, Debtor's urologist, Dr. Elise Perer, stated as follows:

> At this point, [Debtor] wishes to repeat the cytology and FISH test and wishes to hold off on the bladder biopsies, as his FISH is only intermittently positive, his cytology has always been totally negative and his PET CT scan in May was totally negative.

*Id*. Exhibit 37, p. 111.  Thus, Debtor opted not to undergo a biopsy to test further for the presence of cancer.  Debtor testified that his doctors advised that they would only perform a biopsy if both the FISH tests and cytology were positive.  Considering Debtor's cytology results were negative, Debtor did not have a biopsy performed.

Despite three negative FISH tests at the time and no other indication of recurring cancer, in a declaration filed on May 31, 2011, Debtor stated that, since his surgery on October 2009, he had tested positive for cancer on five or more occasions, but his doctors "cannot determine where the cancer is."  Exhibit 17.  In a declaration filed on September 27, 2011, Debtor similarly stated that, since 2009, he "tested positive for cancer again on several occasions" and was "currently" being tested to determine "where the cancer is."  Exhibit 18.

On July 24, 2012, Debtor filed another declaration in which he stated: "Commencing shortly after [my] surgery, I started testing positive for cancer again.  I was unable to get some of the tests that Doctor Perer prescribed for me, which would help locate the cancer so that I would be able to begin treatment.  . . .  I gave-up the fight with my health insurance company to have the tests prescribed by Dr. Perer authorized . . . .  Dr. Perer carries on the battle with my insurance company, but I have not heard from her in many months."  Exhibit 22.  Debtor further declared, "the last test for cancer I had indicated that I have cancer."  *Id.*

On July 30, 2012, six days after Debtor filed this declaration, in her office visit report, Dr. Perer noted that the "patient was feeling well."  Exhibit 37, p. 194.  Dr. Perer also noted that Debtor did not follow up for a while and was asymptomatic.  Exhibit 37, p. 196.  Moreover, during the evidentiary hearing, Debtor stated that, after this office visit, he discontinued seeing Dr. Perer.

Nevertheless, in his deposition taken on October 15, 2014, Debtor stated: "as far as I know, I have cancer."   Exhibit 45.  Debtor also stated that the specific basis for his contention that Debtor had cancer on the Petition Date was the series of FISH tests.  *Id.*

**C. Debtor's Claim of Exemption**

On February 7, 2011, Debtor filed his chapter 7 petition.  On August 4, 2011, Debtor amended his schedule C to claim a disability homestead exemption [doc. 35].

In his schedule C, Debtor stated the following: "Debtor has Cancer and has not been able to work in his business."  On July 17, 2012, Creditors objected to Debtor's claim of disability [doc. 73].

Regarding his claim of disability, Debtor stated in a deposition that he did not take any action to obtain Social Security disability benefits.  Exhibit 45.  However, at the evidentiary hearing, Debtor testified that either he or his wife prepared an application to obtain such benefits.  To date, it appears Debtor has never received Social Security disability benefits.

## II. LEGAL STANDARD

**A.    The Burden of Proof**

Under 11 U.S.C. § 522(l), "[u]nless a party in interest objects, the property claimed as exempt [on debtor's schedules] is exempt."  However, Federal Rule of Bankruptcy Procedure ("FRBP") 4003(b) provides that:

> a party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later.  The court may, for cause, extend the time for filing objections if, before the time to object expires, a party in interest files a request for an extension.

FRBP 4003(b)(1). Prior to the Supreme Court's decision in *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000), bankruptcy courts applied the following burden allocation from the FRBP: "In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed. After hearing on notice, the court shall determine the issues presented by the objections."  FRBP 4003(c).  The Ninth Circuit Court of Appeals adopted this burden allocation when it stated:

> A claimed exemption is presumptively valid…. Initially, this means that the objecting party has the burden of production and the burden of persuasion. The objecting party must produce evidence to rebut the presumptively valid exemption. If the objecting party can produce evidence to rebut the exemption, the burden of production shifts to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper. The burden of persuasion, however, always remains with the objecting party.

*In re Carter*, 182 F.3d 1027, 1029 n. 3 (9th Cir. 1999).  One year after *Carter*, the Supreme

Court issued *Raleigh* and held that a burden of proof allocation is a substantive element of state

law applicable in federal cases when state law is applied:

> Do the State's right and the taxpayer's obligation include the burden of proof? Our cases point to an affirmative answer. Given its importance to the outcome of cases, we have long held the burden of proof to be a "substantive" aspect of a claim. That is, the burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it.

*Raleigh*, at 20-21 (internal citations omitted).

Creditors object to the Court using the burden allocation set forth in *Carter* on the basis

that more recent, post-*Raleigh* decisions shift the burden of proof to debtors. *See In re Pashenee*,

531 B.R. 834 (Bankr. E.D. Cal. 2015); *In re Tallerico*, 532 B.R. 774 (Bankr. E.D. Cal. 2015);

*and In re Barnes*, 275 B.R. 889 (Bankr. E.D. Cal. 2002); *see also In re Davis*, 323 B.R. 732

(B.A.P. 9th Cir. 2005) (Klein, J., concurring).  According to Creditors, the appropriate burden of

proof is provided by CCP § 703.580(b). Pursuant to CCP § 703.580(b), "[a]t a hearing under this

section, the exemption claimant has the burden of proof." Creditors argue that because California

has opted out of the federal exemption scheme found in 11 U.S.C. § 522, bankruptcy courts

analyzing exemptions provided under California law must apply California's burden of proof.

The most in-depth reasoning is provided by *Pashenee*, which found that *Raleigh*

mandates the use of California's burden allocation. *Pashenee*, 531 B.R. at 838-39.  As

summarized by *Pashenee*,

> In *Raleigh,* the debtor of a defunct corporation owed state use taxes. *Raleigh*, 530 U.S. at 18–19, 120 S.Ct. 1951. Those taxes were not paid and the state assessed them to the debtor as the responsible corporate officer. *Id.* The debtor filed a chapter 7 petition and the state filed a proof of claim based on its prior assessment. *Id.* The trustee objected to the proof of claim on the ground that the state had not proven that the debtor was liable for the tax payment. *Id.* The U.S. Supreme Court rejected the trustee's argument reasoning that outside bankruptcy

the corporate officer, *i.e.,* the debtor, would have to prove that he was not the person responsible for filing returns and paying taxes. *Id.* at 20, 120 S.Ct. 1951. Inside the bankruptcy court, the U.S. Supreme Court held that the burden still rested with the debtor, or the trustee as the representative of the debtor's estate. *Id.* at 20–21, 120 S.Ct. 1951.

*Id.*, at 838.  In finding that *Raleigh* controlled, the *Pashenee* court further noted that "while it is true that *Raleigh* involved taxes and this case involves exemptions, both cases nevertheless involve substantive elements of state law." *Id.*, at 839.

In *Pashenee*, the chapter 7 trustee objected to the debtor's claim of exemption in a retirement account under CCP § 703.140(b)(10)(E). *Id.*, at 834.  As part of the objection, the chapter 7 trustee argued that CCP § 703.580(b) was the applicable burden of proof under the Supreme Court's decision in *Raleigh*. *Id.*, at 835.

The *Pashenee* court first addressed *Carter* and FRBP 4003(c), noting that:

The panel in *Carter*, however, did not analyze the burden of proof established by [CCP] § 703.580(b).  In fact, that provision of California exemption law is not cited or referenced in the opinion.  *Carter* simply assumed, without analysis, that the burden of proof is established by Federal Rule of Bankruptcy Procedure 4003(c).  More important, *Carter* predates *Raleigh*.

*Id.*, at 836.  After distinguishing *Pashenee* from several in-circuit cases that applied the *Carter* burden allocation, the court held that FRBP 4003(c) runs afoul of *Raleigh*:

Because California law mandates the use of state exemptions, prohibits the use of federal exemptions, and allocates the burden of proof to the exemption claimant, the court further concludes that California Code of Civil Procedure § 703.580(b) is a substantive element of a California exemption and California exemption law that must be applied inside bankruptcy the same as it would outside bankruptcy. This conclusion is required by *Raleigh* and reinforced by recent U.S. Supreme Court and Ninth Circuit authority. Therefore, the debtor, as the exemption claimant, bears the burden of proof which requires her to establish by a preponderance of the evidence that the $380,348 IRA claimed as exempt in Schedule C is exempt under California Code of Civil Procedure § 703.140(b)(10)(E) and the extent to which that exemption applies.

*Id.*, at 837.  *Pashenee* also stressed that California has opted out of the federal exemption scheme in favor of its own exemption statutes. *Id.*, at 837-38 ("In fact, the state prohibits the use of federal exemptions and permits its debtors only the exemptions allowable under state law.")  The Ninth Circuit Court of Appeals previously stressed this point when it stated that "it is the *entire*

state law applicable on the filing date that is determinative of whether the exemption applies." *In re Jacobson*, 676 F.3d 1193, 1199 (9th Cir. 2012).

Similarly, in *Tallerico*, the debtor claimed exemptions under several California exemption statutes. At a preliminary hearing, the court agreed with an objecting creditor and ruled that at trial the debtor would have the burden of proof based on CCP § 703.580(b) "because this state statute trumps the contrary provision in [FRBP] 4003(c)." 532 B.R. at 777.

In reliance on *Raleigh*, *Tallerico* noted that:

> The linchpin in this case is the question whether the burden of proof in Rule 4003(c) preempts the opposite burden of proof in California Code of Civil Procedure § 703.580(b).
>
> After the Supreme Court determined in *Raleigh* that burden of proof is substantive, not procedural, the answer must be in the negative because the Bankruptcy Rules Enabling Act requires that rules "not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075.

*Id.*, at 787. In further support of its holding, the *Tallerico* court explained:

> That Congress was not intending to alter substantive nonbankruptcy law is apparent from the accommodations that Congress extended to state law in § 522(b). Not only did it permit state-law exemptions always to be available in lieu of the new federal § 522(d) exemptions, it took the extraordinary step of authorizing states to forbid use of the federal exemptions. 11 U.S.C. § 522(b)(2). Such solicitude to state exemption law makes it implausible that Congress simultaneously secretly intended to preempt the state's burden of proof.

*Id.*, at 788.

Though the Bankruptcy Appellate Panel of the Ninth Circuit (the "BAP") has recognized the issue, the BAP has not yet decided whether *Raleigh* , in the context of an exemption based on state law, serves to invalidate the allocation of the burden of proof in FRBP 4003(c). It appears that this issue was first raised by Judge Klein in a concurring opinion. *Davis*, at 740-45. In *Davis*, the majority opinion applied the burden of proof allocation of FRBP 4003(c), noting as follows:

> We express no view about the issue addressed in Judge Klein's concurrence, because it is neither presented in nor dispositive of this appeal. We do note, however, that the Supreme Court in *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000), made clear that burdens of proof could be established by the Bankruptcy Rules as well as by the Bankruptcy Code: "The legislative history indicates that the burden of proof on the issue of establishing

claims was left to the Rules of Bankruptcy Procedure." *Id.* at 22 n. 2, 120 S.Ct. 1951.

*Id.*, at 736 n.5.

Following *Davis*, two unpublished BAP cases recognized the dispute regarding the burden of proof. *See In re Karr*, 2006 WL 6810996 (B.A.P. 9th Cir. Oct. 2, 2006) (unpublished disposition) *and In re Stanley*, 2006 WL 6811019 (B.A.P. 9th Cir. Feb. 2, 2006) (unpublished disposition).  However, both opinions concluded that a determination of the appropriate burden of proof was unnecessary because the prevailing party would have prevailed under either burden. Other post-*Raleigh* BAP cases continued to apply the *Carter* burden allocation without addressing CCP § 703.580(b). *See, e.g. In re Elliott*, 523 B.R. 188 (B.A.P. 9th Cir. 2014); *In re Kelley*, 300 B.R. 11 (B.A.P. 9th Cir. 2003); *and In re Neff*, 2014 WL 448885 (B.A.P. 9th Cir. Feb. 4, 2014) (unpublished disposition).

Thus, the post-*Raleigh* BAP decisions on exemptions are unpublished, do not address the burden of proof issue or concluded that either burden allocation would result in the same disposition.

To date, the Ninth Circuit Court of Appeals has not addressed this issue. Consequently, there is no binding authority that explicitly changes the burden allocation set forth in *Carter* or FRBP 4003(c).

**B.    *Claiming a Disability Exemption***

Pursuant to CCP § 704.730(a)(3)(b), the amount of the homestead exemption is $175,000 if the judgment debtor or spouse of the judgment debtor who resides in the homestead is at the time of the attempted sale of the homestead:

> A person physically or mentally disabled who as a result of that disability is unable to engage in substantial gainful employment. There is a rebuttable presumption affecting the burden of proof that a person receiving disability insurance benefit payments under Title II or supplemental security income payments under Title XVI of the federal Social Security Act satisfies the requirements of this paragraph as to his or her inability to engage in substantial gainful employment.

"Exemption rights are fixed as of the date of the petition." *In re Dore*, 124 B.R. 94, 98 (Bankr. S.D. Cal. 1991). "To claim an exemption under California Code of Civil Procedure

section 704.730(a)(3)(B), a debtor must (a) suffer from a physical or mental disability on the date

of bankruptcy, and (b) be unable to engage in substantial gainful employment as a direct result of

such physical or mental disability." *In re Rolland*, 317 B.R. 402, 419 (Bankr. C.D. Cal. 2004).

In *In re Rostler*, 169 B.R. 408, 413 (Bankr. C.D. Cal. 1994), the court looked to the

Social Security Act, which is explicitly mentioned in CCP § 704.730(a)(3)(B), to define

"substantial gainful employment." Relying on a Ninth Circuit Court of Appeals case which

defined "substantial gainful activity" under the Social Security Act, the court found:

> [W]ork activity is "substantial" if it involves significant physical or mental
> activities. Work activity is "gainful" if it is the kind of work usually done for pay
> or profit, whether or not a profit is realized. Self-employment as well as
> competitive employment is included within the definition of "substantial gainful
> activity."

*Id*. (citing to *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994)).  Consequently, the court set

forth the following standards: "to qualify for the § 704.730(a)(3)(B) exemption…, Debtor must

have been, as of the Petition Date, unable to: (1) perform meaningful mental or physical work-

related activity; (2) in a competitive or self-employed position; (3) that normally results in pay or

profit."  With respect to the debtor's earnings, the court noted that "the relevant inquiry is

whether [the debtor] was engaged in a business that normally results in pay or profit," not

whether the debtor "generate[d] sufficient income for support." Subsequent decisions have relied

on *Rostler*'s three-factor test and definition of "substantial gainful employment."  *See, e.g.*

*Rolland*, 317 B.R. at 420; *and Neff*, 2014 WL 448885 at *8.

In *Rostler*, after finding that the debtor was able to maintain substantial gainful

employment, the court denied the debtor's claim of an enhanced homestead exemption.  The

court relied on the following facts present as of the petition date: (1) despite the debtor having

closed her retail store, she continued to operate the business by purchasing inventory and

employing sales representatives; (2) the debtor was making purchasing and other business

decisions; (3) the debtor planned to enter the real-estate field and was confident she would obtain

a position as a sales agent; (4) the debtor earned $800 per month from operation of her retail

business; and (5) there was no testimony that the debtor was unable to engage in gainful

employment as of the petition date (rather, the doctor who opined that the debtor had a disability examined debtor more than two years after the petition date).

In *In re LaHaye*, 2003 WL 22764771, at *1 (Bankr. N.D. Cal. Sep. 10, 2003), the court looked to federal social security law to determine if a debtor's earnings fell below the amount considered to be "substantial gainful employment."   The *LaHaye* court observed that "[t]he term 'substantial gainful employment' is the same term used in federal social security law. Federal rules define the term as the ability to earn at least $700 per month, plus a modest adjustment for wage increases since 2001." *Id.* (citing to 20 C.F.R. § 404.1574).

The adjusted wage index for substantial gainful activity is provided on the Social Security Administration's website.[6]  The adjusted amount for 2011 is listed as $1,000 per month. In his schedule I, Debtor indicated a monthly income of $950.

However, this is only part of the inquiry.  As noted in *Neff*, the complete question is whether "*as of the petition date*, [the debtor] was able to engage in 'substantial gainful employment' – i.e., that he had the ability to perform meaningful mental or physical work-related activity, in a competitive or self-employed position, which normally results in pay or profit, and that [debtor] was physically, mentally and emotionally able to work enough hours, at a high enough net wage, to contribute materially to his support." *Id.*  Thus, even if Debtor was actually making only $950 per month, the Court must ascertain whether Debtor was *able* to make more.

### III. ANALYSIS

**A.    Under Either Allocation of the Burden of Proof, Debtor Is Not Entitled to a Disability Homestead Exemption Under CCP § 704.730**

As discussed in detail above, courts within the Ninth Circuit dispute whether California's statutory burden of proof or the burden of proof set forth in FRBP 4003(c) is properly applied to contested exemption matters.

Given the Supreme Court's holding *Raleigh*, this Court finds the reasoning of *Pashenee* and similar cases compelling.  Nonetheless, the Court need not decide here which burden of

---

[6] The website is located at http://www.ssa.gov/oact/cola/sga.html.

proof is applicable; as set forth below, Debtor is not entitled to a disability homestead exemption under either allocation of the burden of proof.

**B.      *Debtor Did Not Suffer from a Physical or Mental Disability on the Petition Date***

In his amended schedule C, Debtor claimed a disability exemption under CCP § 704.730, stating that "Debtor has cancer and has not been able to work in his business." After Creditors objected to Debtor's claim of an enhanced disability exemption, Debtor represented that, in addition to having cancer, Debtor suffered from orthostatic hypotension, tinnitus and depression and anxiety. At the time of the evidentiary hearing, Debtor asserted that he is entitled to claim a disability exemption on account of these illnesses.

Of note, Debtor never received Social Security disability benefits. As such, the rebuttable presumption that Debtor qualifies for a disability enhancement does not arise in this case.

**1.      *The Evidence Does Not Show That Debtor Had Tinnitus on the Petition Date***

Among the conditions on which Debtor relies for his disability exemption claim is tinnitus, which Debtor described as a ringing in his ears. Debtor testified that he suffered from tinnitus and that he cannot work because of this condition.

Contrary to Debtor's testimony, the medical records evidenced that Debtor did not seek medical care for tinnitus until November 2011, nine months after the Petition Date. The November 2011 doctor's notes indicate that during his visit, Debtor complained about ringing in his ears. It is unclear if Debtor was ever diagnosed with tinnitus. During the November 2011 visit, Debtor's doctor only noted that Debtor complained of ringing ears and suggested Debtor may have tinnitus; the doctor did not officially diagnose Debtor with this condition.

Assuming Debtor did in fact have tinnitus in November 2011, this is after the relevant time period for claiming a disability exemption. The only credible evidence presented at trial demonstrated that Debtor did not complain about the relevant symptoms until nine months after the Petition Date.

2.      *The Evidence Does Not Show That Debtor Had Orthostatic Hypotension on the*
        *Petition Date*

As with tinnitus, the documentary evidence presented at trial indicated that Debtor did not suffer from orthostatic hypotension as of the Petition Date.  Debtor's medical records from January 19, 2011, a month prior to the Petition Date, indicate that Debtor's orthostatic hypotension had been resolved.

In addition, Debtor testified that he was asymptomatic as long as he kept hydrated, *i.e.*, Debtor did not suffer from the condition if he drank enough water.  Thus, as discussed more fully below, even if Debtor had orthostatic hypotension as of the Petition Date, it did not keep him from substantial gainful employment.

3.      *The Evidence Does Not Show That Debtor Had Cancer on the Petition Date*

Debtor's initial claim of disability was attributed to having cancer.  As noted above, in his amended schedule C, Debtor identified cancer as the basis for his disability exemption. However, Creditors demonstrated that Debtor did not have cancer as of the Petition Date.  Prior to his nephrectomy in October 2009, Debtor had received positive FISH tests.  A bulk of the testimony at the evidentiary hearing concerned the results of these FISH test in the years before and after the Petition Date.  Whatever the accuracy of FISH tests,[7] the evidence demonstrated that Debtor relied on these tests to make decisions about his treatment.

After his nephrectomy, at which time the tumor inside Debtor's kidney was removed, Debtor continued to undergo FISH tests regularly to monitor his condition.  In Debtor's declaration filed on May 31, 2011, Debtor stated: "I had to have my right kidney and ureter removed in October 2009. I have since tested positive for cancer on 5 or more occasions, but my doctors cannot determine where the cancer is."   Exhibit 17.  Contrary to Debtor's declaration, since his nephrectomy in 2009, only two of Debtor's FISH tests, those which took place in May and June 2010, came back positive.  Of the nine FISH tests performed from after the nephrectomy until May 2011, seven came back negative.  Exhibit 38.

---

[7] The parties disputed the reliability of FISH tests.

In addition, contrary to Debtor's declaration filed on July 24, 2012 [Exhibit 22], Dr. Perer's office visit report from July 30, 2012 indicates that Debtor's most recent FISH test results, between April 2011 and August 2011, were negative, and that Debtor was "feeling well." Exhibit 37, p. 194. Dr. Perer also noted that Debtor "was lost to follow up for the past year and is asymptomatic." *Id*. Moreover, Debtor testified that, after his June 2012 appointment, he did not continue to see Dr. Perer.

In fact, as of September 1, 2010, five months prior to the Petition Date, Debtor had already informed Dr. Perer that he wished to "hold off on…biopsies" because his cytology and PET CT scans were "totally negative" Exhibit 37, p. 111.

Other than Debtor's declarations and self-serving testimony, nothing in the record indicates that Debtor had cancer as of the Petition Date. Although Debtor did have two positive FISH test results on May 14, 2010 and June 1, 2010, these results were followed by two negative FISH tests prior to the Petition Date and three more negative FISH tests postpetition. Despite the two positive FISH test results in 2010, Debtor declined to undergo additional procedures to assess his medical condition, such as a CT scan and a traditional MRI. Exhibit 37, p. 196. Rather, Debtor continued to undergo FISH tests, which he did with negative results from July 2010 forward.

### 4.    The Evidence Does Not Show That Debtor Suffered From Depression or Anxiety on the Petition Date

Debtor's medical records and Dr. Kajani's testimony indicated that Debtor exhibited signs of depression and/or anxiety in early 2009. At this time, Debtor sought treatment from a psychiatrist, who prescribed antidepressants. Debtor testified that the original medication he was prescribed made him even more anxious and depressed. However, according to Debtor's own testimony, Debtor's psychiatrist prescribed Debtor different medication and this new medication worked.

The medical records also indicated that Debtor had an episode of depression in December 2010. However, the medical records indicate that Debtor's anxiety and depression had been resolved as of January 19, 2011, two weeks prior to the Petition Date. There were no contrary

1   medical records presented closer in time to the Petition Date, and Debtor did not point the Court

2   to any evidence that would contradict the doctor's notes of January 19, 2011.

3   **C.**   ***Debtor Was Able to Engage in Substantial Gainful Employment as of the Petition Date***

4        Irrespective of his medical condition, Debtor was able to engage in substantial gainful

5   employment as of the Petition Date.  Before and after February 2011, Debtor was continuously

6   involved in several business enterprises, all of which could have generated a sizeable income.

7   Debtor's actual income as of the Petition Date is a relevant factor in ascertaining whether Debtor

8   was able to engage in substantial gainful employment.  However, to gauge whether Debtor

9   qualifies for a disability exemption, it is insufficient to consider only Debtor's actual income.

10   Rather, the Court must assess Debtor's *ability* to earn at least $1,000 per month. *See LaHaye*, at

11   *1.

12        In his schedule I, Debtor represented that he made a total of $950 per month.  As noted

13   above, a debtor may qualify for a disability exemption if he or she does not have the ability to

14   make at least $1,000 per month.  Though Debtor's scheduled income fell within the bracket of

15   eligibility for disability, the evidence *in toto* shows that, on the Petition Date, Debtor was able to

16   engage in employment that was substantially gainful.

17        First, Debtor is and was at all relevant times a licensed and practicing attorney.  During

18   the evidentiary hearing, Debtor testified that he charged an hourly rate of $350 to represent

19   clients and "a lesser amount" to appear on behalf of other attorneys at hearings and depositions.

20   The evidence demonstrated that Debtor was able to work as a practicing litigation attorney as of

21   the Petition Date, at least on a part-time basis.

22        Creditors presented several legal documents filed by Debtor close in time to the Petition

23   Date.  Debtor attempted to discount his efforts by testifying that he was able to work only

24   sparingly throughout the week.  In response to the several legal projects presented by Creditors,

25   Debtor testified that he spent only approximately one to six hours per week on each.  As pointed

26   out by Creditors, using Debtor's hourly rate, this would amount to $350 to $2,100 of income *per*

27   *week*.

28

Moreover, the Court does not find Debtor's testimony credible. Although Debtor states he had trouble working for longer periods of time, the evidence indicates Debtor was actively engaged in litigation as of the Petition Date. Aside from representing himself in the *Dalby* matter, Debtor was defending an appeal and attempting to receive additional income by representing to his colleagues that he was willing to act as an appearance attorney for a lesser hourly rate.

Further, near the time of this litigation, Debtor was engaged in a dispute with his health insurance provider. To resolve the dispute, Debtor drafted demand letters and testified to making phone calls to the insurance provider.

Moreover, in addition to being a practicing attorney as of the Petition Date, Debtor also was working to connect venture capital firms with businesses looking for capital. As previously discussed, Debtor began this enterprise by working for Triumvirate. According to Debtor's own LinkedIn profile and Debtor's testimony, Debtor began working at Triumvirate in April 2009. During his time with Triumvirate, Debtor worked with Venture-Net. After leaving Triumvirate in 2011, Debtor transitioned to working as an associate for Venture-Net Partners. As concerns his work with venture capital firms, there was no gap in Debtor's employment.

Debtor's actual income generated by his employment with Triumvirate and Venture-Net Partners was never specified. However, Debtor testified that he could have made a $150,000 commission from a single transaction. Stated another way, Debtor acknowledged that he was capable of earning $150,000 from these efforts close to the Petition Date. This alone would amount to $12,500 per month in gross income, in addition to Debtor's ability to earn $350 to $2,100 per week doing legal work.

On the Petition Date, Debtor also was wrapping up Lien Medical, Inc. Debtor testified that he was attempting to collect on accounts receivable as of the Petition Date. Moreover, Debtor's LinkedIn profile indicates that, as of March 13, 2011, Debtor remained a member of the Board of Directors of Lien Medical, Inc.

Debtor testified that he still suffers from depression, anxiety, orthostatic hypotension and tinnitus. However, Debtor also testified that he is currently practicing as an attorney and

representing clients.  Debtor has never taken a leave of absence from his legal practice or suspended his license due to a disability.  Though it concerns Debtor's abilities subsequent to the Petition Date, this testimony demonstrates that Debtor is able to work despite his alleged ailments.

During the evidentiary hearing, Debtor emphasized that many of his business ventures were unsuccessful as of the Petition Date and that he made only $950 per month, as listed in his schedules.  That Debtor made less than $1,000 per month as of the Petition Date is not determinative of whether Debtor is eligible for a disability homestead exemption.  The proper inquiry is whether Debtor is "*unable* to engage in substantial gainful employment." *Rolland*, 317 B.R. at 419.

In analyzing Debtor's ability to engage in substantial gainful employment as of the Petition Date, the Court concludes that Debtor was so able.  Under *Carter*, Creditors successfully rebutted Debtor's claim of disability exemption by demonstrating that Debtor was able to engage in substantial gainful employment at that time.  Under California's statutory burden of proof, Debtor did not meet his burden of demonstrating he qualifies for a disability exemption.

### IV. CONCLUSION

In light of the foregoing, the Court will sustain the Objection.  The Court will prepare an order conforming to this decision.

###

Date: January 12, 2016

Victoria S. Kaufman
United States Bankruptcy Judge