

FILED & ENTERED

SEP 30 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>KEVAN HARRY GILMAN,<br><br><br><br><br><br>Debtor. | Case No.: 1:11-bk-11603-VK<br><br>Chapter 7<br><br>**MEMORANDUM OF DECISION DENYING MOTION FOR RECOVERY OF ADMINISTRATIVE EXPENSE FILED BY CREDITORS TAMMY R. PHILLIPS AND TAMMY R. PHILLIPS, A PROFESSIONAL LAW CORPORATION**<br><br>Date:  July 21, 2022<br>Time:  1:30 p.m.<br>Place:  Courtroom 301<br>        21041 Burbank Blvd.<br>        Woodland Hills, CA 91367 |

The motion seeks the allowance of administrative expenses to movants under 11 U.S.C. § 503(b). The Court has jurisdiction over this issue because it arises under a provision of title 11 of the United States Code. 28 U.S.C. § 1334(b). For the same reason, the Court has the constitutional authority to enter a final order disposing of the motion. *See Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015).

## I. BACKGROUND

On February 7, 2011, Kevan Harry Gilman ("Debtor") filed a voluntary chapter 7 petition, commencing case no. 1:11-bk-11603-VK (the "Case"). Amy L. Goldman was appointed the chapter 7 trustee (the "Trustee"). On June 21, 2011, the Trustee caused to docket the *Chapter 7 Trustee's Report of No Distribution* (the "First No Asset Report").

When he filed his chapter 7 petition, Debtor resided, with his then-spouse and their daughter, in a house located at 6553 Varna Avenue, Los Angeles, California (the "Residence"). In May 2021, Debtor passed away.

Over more than ten years, Tammy R. Phillips and Tammy R. Phillips, a Prof. Law Corp. (together, "Creditors"), have engaged in extensive litigation and appeals concerning the Case, including, but not limited to, the nondischargeability of their claims, the amount of their claims, Debtor's claims of exemptions, Debtor's receipt of a discharge, motions filed by other parties in interest to obtain relief from the automatic stay, sanctions motions which Creditors filed, the Trustee's employment of professionals and the Trustee's proposed abandonment of assets. Creditors also filed an adversary proceeding against the Trustee, which was dismissed with prejudice. Because of this litigation and Creditors' related appeals, and irrespective of the denial of Debtor's discharge in November 2016 and his subsequent death in May 2021, the Case has not yet closed. **[FN 1]**

**A.    Proofs of Claim Filed Against the Bankruptcy Estate**

　　1.    ***Prepetition Claims***

In January 2021, the Trustee withdrew the First No Asset Report [doc. 780]. A few days later, the Trustee filed a *Notice of Asset Case* [doc. 783].

Because of that notice, a bar date for prepetition claims was set for May 3, 2021 [doc. 783].  Only the following proofs of general unsecured claims have been filed:

American Express National Bank ("Amex") filed a nonpriority unsecured claim in the amount of $1,002.11 (Claim No. 1) and a second nonpriority unsecured claim in the amount of $6,935.48 (Claim No. 2).

Tammy R. Phillips filed a nonpriority claim in the amount of $1,127,907.14, asserting a secured portion of $185,074.19 (Claim No. 3).  Because of a judgment lien, originally recorded on April 11, 2008, and reflecting an initial judgment amount of $22,943.00, Claim No. 3 is partially secured.

Tammy R. Phillips, a Prof. Law Corp., filed a nonpriority claim in the amount of $809,974.71, asserting a secured portion of $43,079.48 (Claim No. 4).  Because of a judgment lien, originally recorded on September 10, 2008, and reflecting an initial judgment amount of $27,966.30, Claim No. 4 is partially secured.  Together, Claim No. 3 and Claim No. 4 will be referred to as "Creditors' Proofs of Claim".

2.    ***Administrative Expense Claims***

In the Case, the Court set a deadline of April 15, 2022 by which parties, other than professionals employed at the expense of the estate, must file and serve requests for payment of administrative expense priority claims of the kind described in 11 U.S.C. § 503(b) and entitled to priority under 11 U.S.C. § 507(a)(1) [doc. 860].

On March 3, 2022, Debtor's former spouse Kwei-Shiang Y. Gilman, ("Ms. Gilman") filed a proof of claim for allowance of administrative expenses in the amount of $16,323.09 (Claim No. 5).  In April 2022, after Creditors filed an Objection to Ms. Gilman's proof of claim [doc. 876], Ms. Gilman withdrew that claim [doc. 879].

On April 15, 2022, Creditors filed a *Motion for Recovery of Administrative Expenses* (the "Section 503(b) Motion") [doc. 875].  On June 24, 2022, Creditors filed a supplement to the Section 503(b) Motion, in which they sought an award of additional administrative expenses (the "June 2022 Supplement") [doc. 884].  In these pleadings, Creditors have not clearly set forth the specific amount of the administrative expense they seek to have allowed.  Instead, Creditors

provide a summary of services provided by their counsel, on certain issues.  Based on Creditors'

counsel receiving fees, for these services, in the amount of $500.00 per hour, Creditors request

that they be awarded a claim for administrative expenses.

**B.    Creditors' Objections to Debtor's Homestead Exemption Claim**

On February 21, 2011, Debtor filed his Schedule A and listed his interest in the

Residence [doc. 12].  Debtor originally listed the Residence with a value of $470,000.00.  In his

Schedule D, Debtor listed claims secured by first and second deeds of trust in the aggregate

amount of $329,000.00 [doc. 5].

In his original Schedule C, Debtor claimed a homestead exemption in the amount of

$137,000.00.  Debtor cited California Code of Civil Procedure ("CCP") § 704.730 as the basis

for the exemption; the schedule stated, "Debtor has Cancer and has not been able to work in his

business." [doc. 12].

On June 25, 2011, Creditors objected to Debtor's exemptions [doc. 30].  Because Debtor

did not file a timely response to Creditors' objections, the Court sustained Creditors' objections

[doc. 37].  Debtor subsequently filed a motion to set aside the initial order disallowing his

exemptions [doc. 45], which the Court granted [doc. 63].

On August 4, 2011, Debtor filed amended Schedules A and C, stating the value of the

Residence was $433,000.00 and claiming a homestead exemption in the amount of $104,000.00

under CCP § 704.730 [doc. 35].  Like the initial Schedule C, the amended Schedule C stated,

"Debtor has Cancer and has not been able to work in his business." [doc. 35].  **[FN 2]**.

On July 17, 2012, Creditors filed a *Notice of Motion and Renewed Motion Re: Objection

to Debtor's Claim of Homestead Exemption* (the "Objection to Exemption") [doc. 73].  On

January 6, 2015, the Court overruled the Objection to Exemption, except as to Debtor's claim of

a disability enhancement to his homestead exemption (the "Homestead Exemption Order") [doc.

315].  After an evidentiary hearing, the Court sustained Creditors' objection to Debtor's claim of

a $4,000.00 disability enhancement to his $100,000.00 homestead exemption [doc. 433].

On January 20, 2015, Creditors filed a *Notice of Motion and Motion for New Trial, to

Amend/Alter Judgment, or, Alternatively, for Relief from Judgment of January 6, 2015* (the

"Motion for New Trial") [doc. 321].  In April 2015, after a hearing on that motion, the Court

entered an order denying the Motion for New Trial [doc. 368].

In 2015, Creditors appealed the Homestead Exemption Order [doc. 361].  The district

court affirmed that order [doc. 495].  On August 22, 2016, Creditors appealed the district court's

ruling to the Ninth Circuit Court of Appeals [doc. 496].  In 2018, the Ninth Circuit Court of

Appeals issued an opinion remanding the Court's original decision for the Court to decide two

remaining issues: (1) whether Debtor intended to reside at the Residence when the Case was

filed; and (2) whether any equitable theories under California law prevented Debtor from

claiming a homestead exemption under CCP § 704.730 [doc. 602].

In January 2019, the Court held an evidentiary hearing regarding Creditors' objections to

Debtor's $100,000.00 homestead exemption.  After that hearing, the Court determined that

Debtor intended to reside at the Residence when the Case was filed, and that the equitable

theories asserted by Creditors did not prevent Debtor from claiming his homestead exemption

under CCP § 704.730 [docs. 674 and 692].  Consequently, the Court sustained Debtor's

homestead exemption (without the disability enhancement) in the amount of $100,000.00.

Creditors appealed that decision [doc. 697].  In October 2020, the district court affirmed

that decision [doc. 756]. Creditors have appealed the district court's order, and Creditors' appeal

of the ruling regarding Debtor's $100,000.00 homestead exemption is pending before the Ninth

Circuit Court of Appeals [doc. 764].

**C.    Creditors' Litigation Directed at the Trustee**

> 1.    ***Opposition to the Trustee's Employment of Professionals, No Asset Reports and Notices of Abandonment***

On November 26, 2020, Creditors filed a *Notice of Motion to Direct Administration and

Re-Investigation or, in Alternative, Replace Trustee* (the "Estate Administration Motion") [doc.

761].  In that motion, Creditors requested an order directing the Trustee to administer Debtor's

estate, including by selling Debtor's real properties and "re-investigating Debtor's malpractice

assets for prosecution or sale." Alternatively, Creditors requested an order "replacing the trustee"

[doc. 761].  In the Estate Administration Motion, Creditors contended that, "[e]ven with

administrative costs the facts show assets sufficient to make distributions to unsecured creditors."

In December 2020, the Trustee filed an application to employ Levene, Neale, Bender, Yoo & Brill L.L.P. as her general bankruptcy counsel (the "LNBY&B Application") [doc. 765]. Creditors filed a response to the LNBY&B Application and requested that it be set for hearing [doc. 767]. Creditors subsequently requested that the Court strike the Trustee's reply and filed other pleadings in response to the Trustee's reply [docs. 772, 773, and 775]. Following the hearing, the Court granted the LNBY&B Application [docs. 776 and 781].

In June 2022, based on the Trustee's recovery of funds from Ms. Gilman, including income tax refunds, the Trustee filed a motion for authorization to employ and pay a flat fee of $1,000.00 to a tax preparer [doc. 882]. Creditors filed an objection to that motion and requested a hearing; Creditors stated that their objection would be withdrawn if no more than $450.00 would be paid to the tax preparer [doc. 883]. Because of Creditors' objection to the motion and request for a hearing, the Trustee had to provide notice of the hearing, the Trustee filed a reply and her counsel appeared at the hearing [docs. 886, 887 and 895]. At the hearing on that motion, the Court overruled Creditors' opposition and granted the motion [doc. 896].

On May 13, 2021, Debtor's counsel filed a notice of Debtor's death [doc. 793]. That day, the Trustee filed a notice of her intent to abandon the Residence and Debtor's other real property, located at 9010 Corbin Avenue, Northridge, California (the "Real Property Abandonment Notice") [doc. 794]. As stated in the Real Property Abandonment Notice, after taking into account their current market values and the mortgages, prepetition judgment liens, tax liens and other liens against each property, there was no realizable equity in either property; "the amount of secured debts, estimated costs of sale, potential tax consequences and estimated administrative fees exceed the anticipated value of the properties." *Id*. The Trustee also filed notice of her intent to abandon alleged malpractice claims in connection with Debtor's prepetition legal representation (the "Claim Abandonment Notice") [doc. 795]. Creditors objected to the Real Property Abandonment Notice and the Claim Abandonment Notice.

On July 20, 2021, the Court authorized the Trustee's abandonment of the alleged malpractice claims [doc. 819]. On July 27, 2021, the Court authorized the Trustee's abandonment of Debtor's real properties, including the Residence [doc. 824]. Creditors filed a motion to reconsider the Court's authorization of abandonment of the malpractice claims (the "Motion to Reconsider") [doc. 827], which the Court denied [doc. 846].

On August 5, 2021, the Trustee caused to docket her second *Chapter 7 Trustee's Report of No Distribution* (the "Second No Asset Report"). Creditors filed an objection to the Second No Asset Report [doc. 830] and an accompanying declaration in support [doc. 833], and the Trustee filed a reply [doc. 877].

On February 17, 2022, the Court held a hearing regarding the Second No Asset Report. Creditors contended that it was inappropriate for the Trustee to abandon Debtor's income tax refunds, certain post-petition rents and funds received from an attorney-client trust account; Debtor's former spouse, Ms. Gilman, allegedly had received the refunds, rents and the funds from the attorney-client trust account. The Trustee contended that any turnover may be offset by Ms. Gilman's right to allowed administrative expenses, based on expenses that Ms. Gilman had paid regarding Debtor's real properties. In the Trustee's business judgment, the fees and costs associated with administering Debtor's purported rents, tax refunds and trust account payment would be "burdensome and of inconsequential value and benefit to the estate." [doc. 852].

At the hearing, the Court ruled that, although Ms. Gilman may be entitled to the allowance of offsetting administrative expenses, it was premature for the Court to conclude that the Trustee should not administer those assets, e.g., by demanding that Ms. Gilman turn over any rents, income tax refunds and other funds that Ms. Gilman had received. Pending the setting of deadline to file a request for payment of administrative expenses, and the outcome of any turnover demand presented to Ms. Gilman by the Trustee, the Court continued the hearing to May 12, 2022.

On May 6, 2022, the Trustee withdrew the Second No Asset Report [doc. 880]. On May 10, 2022, the Trustee filed a pleading stating that she had made demand on Ms. Gilman to turn over estate assets and that Ms. Gilman had paid $53,794.46 to the Trustee [doc. 881].

2.    ***Creditors' Complaint for Breach of Fiduciary Duty***

On February 17, 2022, Creditors filed a *Complaint for Breach of Fiduciary Duty* (the "Complaint") [doc. 1] against the Trustee individually and in her capacity as the chapter 7 trustee, commencing adversary proceeding no. 1:22-ap-01014-VK (the "Trustee Action").  On April 20, 2022, the Trustee filed a motion to dismiss the Trustee Action (the "Motion to Dismiss") [doc. 12].  Creditors opposed the Motion to Dismiss [docs. 17 and 19], and the Trustee filed a reply [doc. 20].

On June 1, 2022, the Court held a hearing and granted the Motion to Dismiss with prejudice.  On June 9, 2022, the Court entered its order granting the Motion to Dismiss (the "Order Dismissing Trustee Action") [doc. 24].  On June 22, 2022, Creditors appealed the Order Dismissing Trustee Action [doc. 26].

**D.    Creditors' Responses to Relief from Stay Motions**

In September 2019, U.S. Bank Trust National Association ("US Bank") sought relief from the automatic stay to start foreclosure proceedings against the Residence (the "First RFS Motion") [doc. 675].  US Bank was the beneficiary of an assigned first deed of trust recorded on December 31, 2003, which encumbered the Residence.  In the First RFS Motion, US Bank noted that payments on its debt against the Residence had not been made since September 2012, and that the loan secured by that deed of trust had matured in 2014 [doc. 687].

Creditors, who have judgment liens against the Residence which are junior to the lien of US Bank [doc. 679], filed an opposition to the First RFS Motion.  Because US Bank's interest in the Residence was adequately protected, the Court denied the First RFS Motion [doc. 695].

Approximately two years later, in September 2021, after the Trustee abandoned the estate's interest in the Residence (as authorized by the Court), US Bank filed a second motion for relief from the automatic stay regarding the Residence (the "Second RFS Motion") [doc. 835], stating that 109 deed of trust payments, totaling $358,851.98, had come due and were not made as of September 2021.  Creditors filed an opposition to this motion, in which Creditors also sought sanctions.  On October 14, 2021, the Court denied the Second RFS Motion [doc. 840].

1  Despite the abandonment of the Residence, based on an equity cushion, US Bank's interest in the
2  Residence remained adequately protected.

3      Because Debtor had died following US Bank's filing of the First RFS Motion [doc. 793],
4  the Trustee had abandoned the Residence [doc. 824] and given the time which had passed
5  between US Bank's filing of the Second RFS Motion and the First RFS Motion [doc. 675], the
6  Court denied Creditors' request for sanctions.  **[FN 3]**

7  **E.    Section 503(b) Motion**

8      In April 2022, Creditors filed the Section 503(b) Motion.  Creditors contend that they are
9  entitled to an allowance of administrative expenses based on services provided by their counsel
10 and the consequential attorney's fees.  Citing: (1) 11 U.S.C. § 503(b)(1)(A); (2) § 503(b)(3)(D)
11 and 503(b)(4); and (3) the general language of § 503(b), Creditors seek repayment for their
12 counsel's services, at $500.00 per hour [doc. 875].

13     In the Section 503(b) Motion, Creditors sought administrative expense status for their
14 counsel's fees arising from 229.6 hours provided concerning Debtor's homestead exemption and
15 apparently for additional hours allegedly spent by their counsel, beginning in May 2019: (1) to
16 oppose US Bank's first and second motions for relief from stay as to the Residence and to obtain
17 an assignment to Creditors of any COVID-19 economic stimulus payments made by the federal
18 government to Debtor (77.7 hours); (2) to prepare the Estate Administration Motion (10.9
19 hours); (3) to respond to the Trustee's application to employ bankruptcy counsel (27.45 hours);
20 (4) to prepare Creditors' Proofs of Claim (36.7 hours); (5) to assess issues and prepare pleadings
21 regarding Debtor's death (13.8 hours); (6) to oppose the Trustee's proposed abandonment of
22 assets (38.1 hours); (7) to object to the First and Second No Asset Reports (36.2 hours); (8) to
23 oppose a motion, filed by Debtor, which would delay his divorce trial and to respond to a motion
24 for relief from stay concerning Debtor's probate estate (15.1 hours); and (9) to prepare and
25 prosecute the Section 503(b) Motion (19.3 hours).  *See* doc. 875, p. 10, lines 21-28, and p. 11,
26 lines 1-4 and the exhibit attached thereto.

27     Creditors contend that their efforts were of an "administrative nature," and as such, they
28 should have allowed administrative expenses under the general language of § 503(b) [doc. 875].

Creditors state that they provided benefit to the estate by filing "a motion to cause the [T]rustee to take action…and by preventing the [T]rustee from closing the case based on an inaccurate report of no distribution." [doc. 875].  Creditors argue that the propriety of their claim "is underscored by the common fund doctrine." [doc. 875].  **[FN 4].**

On June 24, 2022, in connection with the Section 503(b) Motion, Creditors filed the June 2022 Supplement.  Among other things, the June 2022 Supplement requests that Creditors' allowed administrative expenses include an additional 15.25 hours of time billed by their counsel, at $500.00 per hour, amounting to $7,625.00 [doc. 884].  Creditors state that their counsel spent 14 hours preparing an objection to Ms. Gilman's request for allowance of administrative expenses (in the amount of $16,323.09), and 1.25 hours regarding the Trustee's reply to Creditors' objection to the Second No Asset Report [doc. 884].

The Trustee filed an opposition to the Section 503(b) Motion (the "Opposition") [doc. 889], stating, among other things, that Creditors did not timely provide sufficient time records. The Trustee also contends that the Court should not allow Creditors' alleged administrative expenses when the vast majority of the time incurred did not provide any benefit to Debtor's estate and certain litigation only benefitted Creditors.

On July 7, 2022, Creditors filed a reply to the Opposition (the "Reply") [doc. 892] and a request for judicial notice [doc. 893], and on July 8, 2022, they filed a supplement to the Reply [doc. 894] (the "July 2022 Supplement").  **[FN 5].**  Creditors contend that, but for Creditors' efforts, the estate would not have funds for distribution.  Creditors also state that 229.6 hours (amounting to $114,800.00 in attorney's fees, at $500.00 per hour) arise from the "defeat of Debtor's disability claim" **[FN 6]** and 66.4 hours (amounting to $33,200.00 in attorney's fees, at $500.00 per hour) relate to: (1) 36.2 hours for objecting to the Second No Asset Report; (2) 10.9 hours for preparing the Estate Administration Motion; and (3) 19.3 hours for preparing and prosecuting the Section 503(b) Motion [docs. 892 and 894].

## II. STATUTORY AUTHORITY AND CASELAW

11 U.S.C. § 503(b) provides in pertinent part:

After notice and a hearing, there shall be allowed, administrative expenses, other than

claims allowed under section 502(f) of this title, including—

(1) (A) the actual, necessary costs and expenses of preserving the estate…

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

…

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title; **[FN 7]**

…

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

Requests for allowance of administrative expenses under § 503(b) must be strictly construed as they "reduce the funds available for creditors and other claimants." *In re Connolly North America, LLC*, 802 F.3d 810, 816 (6th Cir. 2015).  "The terms 'actual' and 'necessary' must be narrowly construed to preserve the estate." *In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 689 (Bankr. S.D. Cal. 1998).  In the Ninth Circuit, the "principal test of substantial contribution is 'the extent of benefit to the *estate*.'" *In re Cellular 101, Inc.*, 377 F.3d 1092, 1096 (9th Cir. 2004) (emphasis added).  Substantial contribution "requires contribution which provides *tangible benefits* to the bankruptcy estate and the other unsecured creditors." *D.W.G.K.*, 84 B.R. at 689 (*quoting Matter of Patch Graphics*, 58 B.R. 743, 746 (Bankr. W.D. Wis. 1986)) (emphasis added).

"The burden of proving an administrative expense claim is on the claimant." *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995).  "The

administrative expense applicant must prove entitlement to the requested reimbursement by a preponderance of the evidence." *In re Nichols*, 2010 WL 6259965, at *5-6 (9th Cir. BAP March 17, 2010), *citing Gull Indus. v. John Mitchell, Inc. (In re Hanna)*, 168 B.R. 386, 388 (9th Cir. BAP 1994).  "The bankruptcy court has broad discretion to determine whether to grant such a claim." *DAK Indus.*, 66 F.3d at 1094 (citing *In re Dant & Russell, Inc.,* 853 F.2d 700, 706 (9th Cir. 1988)).

## A.    11 U.S.C. § 503(b)(1)(A)

In general, an administrative expense may be allowed under § 503(b)(1)(A) when the claimant shows the debt was actual and necessary to preserve the estate.  This statute is construed narrowly to keep administrative expenses to a minimum.  *See DAK Indus.*, 66 F.3d at 1094.

Section 503(b)(1)(A) "is explicit.  Any claim for administrative expenses and costs must be the actual and necessary costs of preserving the estate for the benefit of its creditors." *In re Machevsky*, 637 B.R. 510, 526 (Bankr. C.D. Cal. 2021).  "An actual benefit must accrue to an estate." *Id*. **[FN 8].**

*DAK Indus.* set forth the two-part standard for an expense to be allowed as an administrative claim under § 503(b)(1)(A).  "The claimant must show that the debt asserted to be an administrative expense (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate." *DAK Indus.*, 66 F.3d at 1094. **[FN 9].**

In *DAK Indus.*, a creditor claimed an administrative expense for a debtor's postpetition use of a licensure agreement.  The creditor had a prepetition agreement with the debtor, which "gave [the debtor] the right to adapt [the software] to enable it to run on computer systems sold by [the debtor], to copy [the software], and to distribute and license [the software] to consumers during a specified term." *Id*. at 1092.

Prior to filing its chapter 11 petition, the debtor made a down payment, with the remaining amount due to the creditor to be paid in future installments.  *Id*. at 1095.  Although the

debtor did not make these postpetition payments, the debtor continued to sell copies of the software.  *Id*. at 1093.

The Ninth Circuit Court of Appeals noted:

§ 503's principal purpose is to induce entities to do business with a debtor after bankruptcy by insuring that those entities receive payment for services rendered…Payment of administrative expenses allows the debtor to secure goods and services necessary to administer the estate, which ultimately accrues to the benefit of all creditors.

*Id*. at 1097.  Because the creditor "was not induced to and did not do business with the debtor postpetition," the creditor was not entitled to an administrative expense claim. *Id*. at 1096-97.

In *Machevsky*, 637 B.R. at 522-23, a creditor sought approval of an administrative claim under § 503(b)(1)(A) for expenses including: (1) a lump sum paid to a secured lienholder in connection with real property owned by the debtor; (2) additional ongoing monthly payments to the secured lienholder; and (3) a portion of defaulted real property taxes.  At the time the creditor paid many of its claimed expenses, it was dealing directly with the debtor and was not aware of the bankruptcy case or the trustee.  *Id*. at 525.  Even after the creditor became aware of the bankruptcy case, the creditor made expenditures without the trustee's involvement.  *Id*.

The court held that "[none] of [the creditor's] expenditures relating to the property arose from a transaction with the [c]hapter 7 trustee." *Id*. at 525.  The court reasoned that the expenses "relating to the real property, an asset of the chapter 7 bankruptcy estate, were incurred in transactions with the [d]ebtor," and "either [the creditor] lacked knowledge of the existence of the bankruptcy trustee or it made the expenditure[s] on its own with knowledge of the trustee's existence, but without the trustee's involvement."  *Id*.

The court then considered whether the creditor gave consideration to the trustee and noted the creditor would need to prove that the trustee "induced the creditor's performance, and that performance was then rendered by the creditor to the estate."  *Id*. at 526.  Because "the evidence show[ed] that [the creditor] rendered [its] performance to further its own interests in

purchasing the property in its transaction with the [d]ebtor", the court held that the creditor did not prove the trustee induced its performance. *Id*.

In *Nichols*, 2010 WL 6259965, at *1 (9th Cir. BAP March 17, 2010), the debtor had a one-third interest in a lakeside cabin. The chapter 7 trustee determined that the debtor had only a life estate in this property and that the debtor's interest had little or no market value. *Id*. Subsequently, the trustee filed a "No Asset Report." *Id*. Certain creditors disagreed and filed a motion to compel the trustee to sell assets, including the debtor's interest in the real property. *Id*. The trustee withdrew her No Asset Report. *Id*. The trustee filed a motion to sell the debtor's interest in the cabin. *Id*. at *2. The debtor and her co-owners in the property (her brothers) made the highest bid and acquired the debtor's interest in the property for $50,010.00. *Id*.

After the sale, the debtor filed an application for allowance and payment of administrative expenses for $14,280.00 under § 503(b)(1)(A), based on expenses paid post-petition to preserve the cabin. *Id*. at *2-3. The expenses consisted of "property hazard insurance, real property taxes, utility costs, and non-labor 'out of pocket expenses' for the [p]roperty." *Id*. at *2. The chapter 7 trustee had not approved any of the expenses.

Because the chapter 7 trustee had not approved of the debtor's payment of these expenses, the Ninth Circuit Bankruptcy Appellate Panel (the "BAP") held that "there was no transaction with or inducement from the [t]rustee." *Id*. at *6. Given that the bankruptcy court properly found that the chapter 7 trustee did not authorize the payment of the expenses, the BAP noted that the bankruptcy court was "not required to address the second prong of the *DAK Indus.* test, whether the alleged administrative expense claim directly and substantially benefitted the estate." *Id*.

**B.    General Authority Under 11 U.S.C. § 503(b)**

In *Connolly*, 802 F.3d at 812-13, the Sixth Circuit Court of Appeals considered whether to allow an administrative expense claim asserted by creditors in a *chapter 7* case, i.e., although 11 U.S.C. § 503(b)(3)(D) and (4) refers only to cases under chapters 9 and 11. In *Connolly*, three unsecured creditors successfully removed the bankruptcy trustee for misfeasance. The successor trustee then commenced an adversary proceeding against his predecessor, reaching a settlement

that significantly increased the amount of funds available for the estate and its creditors. *Id*. at 813.

Despite determining that they had contributed substantially to achieving the settlement, the bankruptcy court denied the application of two of the creditors for reimbursement of administrative expenses, holding that such reimbursement could not be made in a chapter 7 case. *Id*. The district court affirmed that decision. *Id*. The Sixth Circuit Court of Appeals (with one dissent) reversed and remanded for the bankruptcy court to consider the merits of the creditors' request for reimbursement. *Id*.

The Sixth Circuit Court of Appeals held that § 503(b)(3)(D) "does not divest bankruptcy courts of authority to allow reimbursement under § 503(b) of reasonable administrative expenses of creditors whose efforts substantially benefit the bankruptcy estate and its creditors in a Chapter 7 proceeding." *Id*. at 819. "Failing to award administrative expenses to the rare Chapter 7 creditors who are forced by circumstances to take action that benefits the bankruptcy estate when no other party is willing or able to do so, would deter them from participating in bankruptcy cases and proceedings, which is plainly inconsistent with the purposes of [the Bankruptcy Code]. This militates in favor of interpreting § 503(b) to embrace reimbursement of administrative expenses in cases such as this one." *Id*. at 818 (internal quotations omitted).

The Court of Appeals further noted that "by using the term 'including' in the opening lines of the subsection, Congress built a mechanism into § 503(b) for bankruptcy courts to reimburse expenses not specifically mentioned in § 503(b)'s subsections." *Id*. at 816.

Assuming a claimant in a chapter 7 case may obtain allowed administrative expenses under § 503(b), that claimant still must show that the expenses substantially benefitted the bankruptcy estate. *See In re Maqsoudi*, 566 B.R. 40, 45 (Bankr. C.D. Cal. 2017).

In *Maqsoudi*, 566 B.R. at 45, a creditor assisted the trustee in "an adversary proceeding that resulted in the recovery and sale of property *which produced a surplus estate*." (emphasis added). The creditor requested approval of administrative expenses "outside the framework of § 503(b)(3)(B) or (D)." *Id*. at 43. Instead, the creditor "relie[d] on the language of § 503(b), which uses the word 'including,' to make an argument that the enumerated administrative

expense categories [in § 503(b)] are not exhaustive." *Id*.  The court allowed the creditor's claim, noting that "where a creditor has made a substantial contribution to a Chapter 7 case, the Bankruptcy Court has discretion to allow an administrative expense in accordance with the equities of the case." *Id*. at 45.

In contrast, in *Machevsky*, a creditor in a chapter 7 case sought allowance of administrative expenses in the amount of $160,602.57, for paying expenses relating to a piece of real property. *Machevsky*, 637 B.R. at 541.  When the real property—the only asset of value— was sold, it resulted in net proceeds of $133,879.72 to the bankruptcy estate. *Id*. at 542.  The court noted that "the estate [would be] administratively insolvent based on allowance of [the creditor's] claim for substantial contribution in the amount of $160,602.57." *Id*.  Additionally, the case involved "intensive litigation of contested matters," and although the trustee's and the trustee's professionals' administrative expense claims were unknown, the court noted that "the professional fees [were] likely to be large." *Id*. at 544.

The court held that the creditor did not show that it substantially contributed to the benefit of the estate. *Id*. at 545.  The court reasoned that:

> If [the creditor's] claim of $160,602.57 were allowed in full as a substantial contribution claim under 11 U.S.C. § 503(b)(3)(D), it would swamp the available funds in the estate of $133,879.92, causing the other administrative expense claimants, namely, the trustee and his professionals, to share the available funds on a pro rata basis under 11 U.S.C. §§ 507(a)(2) and 726(a) and (b), with no funds available for distributions to creditors holding general unsecured claims.

*Id*. at 543.  "[O]n this record, there was no substantial contribution here because the estate is left administratively insolvent with only the secured creditors getting paid, the trustee and estate professionals having to take an involuntary discount on their fees and no distribution to general unsecured creditors." *Id.* at 545.

C.    **Substantial Contribution to the Estate**

"[A]t bottom, the principal test for whether services provided a substantial contribution to a bankruptcy case is gauged by examining the extent of the benefit bestowed by those services

on the bankruptcy estate as a whole." *In re Treasure Valley Marine, Inc., LLC*, 2020 WL
6821789, at *14 (Bankr. D. Idaho Oct. 15, 2020) (*citing Christian Life Ctr. Litig. Def. Comm. v.
Silva (In re Christian Life Ctr.)*, 821 F.2d 1370, 1373 (9th Cir. 1987)).  "Services which are
provided solely for the client-as-creditor, such as those services rendered in prosecuting a
creditor's claim, are not compensable." *D.W.G.K.*, 84 B.R. at 689.

In *Cellular 101*, 377 F.3d at 1097, a creditor substantially contributed to the bankruptcy
estate when it filed and obtained confirmation of "the only plan…presented to the bankruptcy
court."   The confirmed chapter 11 plan resulted in 100% repayment to all allowed claims, "with
funds remaining for the equity security holders." *Id*.  The Ninth Circuit Court of Appeals held
that these actions constituted a substantial contribution to the bankruptcy estate. *Id*.

In *In re Maust Transport, Inc.*, 589 B.R. 887, 891 (Bankr. W.D. Wash. 2018), a trustee
was unable to locate a firm to represent him on a contingency fee basis to pursue a fraudulent
transfer claim.  A creditor later located a firm to represent the trustee. *Id*.  The subsequent
settlement resulted in net funds to the estate in the amount of $130,830.57, as well as the
elimination of a deficiency claim exceeding $2.98 million. *Id*. at 898-99.  The court held that the
creditor made a substantial contribution to the estate when it assisted the trustee, and reasoned
that if not for the creditor's actions, the recovered funds would not have been available for
distribution. *Id*. at 891 and 899.  Consequently, under § 503(b)(3)(A) and (b)(4), the court
allowed $28,837.50 in administrative expenses to that creditor.

Even when a "substantial contribution" has been made, courts have allowed only those
fees incurred for the estate's benefit.  For example, in *Cellular 101*, notwithstanding the
creditor's substantial contribution to the bankruptcy estate by being the proponent of a confirmed
chapter 11 plan, which paid creditors *in full*, the bankruptcy court allowed approximately half of
the creditor's request for allowance of an administrative expense. *Cellular 101*, 377 F.3d at
1095.

In *Maqsoudi*, in considering the creditor's administrative expense request, the court
concluded that certain activities, including "opposing [a] motion to convert, attendance at status
conferences, and activities generally related to the [c]reditor's claim" were performed only for

1    the creditor's benefit, and not the estate.  *Maqsoudi*, 566 B.R. at 45.  The court ultimately

2    allowed an administrative expense claim in the amount of $8,491.02, which reflected "only those

3    services which were performed for the estate's benefit."  *Id*. at 46.

4                                    **III. ANALYSIS**

5         Here, Creditors have not shown that they are entitled to allowance of administrative

6    expenses.

7    **A.    11 U.S.C. § 503(b)(1)(A)**

8         Creditors do not meet the standard under 11 U.S.C. § 503(b)(1)(A); Creditors have not

9    shown that their expenses arose from a transaction with the Trustee, or that the Trustee

10   authorized Creditors' actions.    Although Creditors assert that the Trustee induced them to incur

11   expenses, there was no agreement between Creditors and the Trustee allowing them to act on

12   behalf of the estate.  Moreover, the Trustee did not ask Creditors' counsel to provide any services

13   for which an administrative expense has been asserted.

14        Even if the transaction requirement were satisfied, Creditors' actions did not directly and

15   substantially benefit the estate. Regarding Creditors' extensive litigation concerning Debtor's

16   claim of a $4,000.00 disability enhancement to his $100,000.00 homestead exemption, Creditors'

17   work related to this litigation did not provide a benefit the estate.  With the approval of the Court,

18   the Trustee has abandoned the Residence.  Similarly, Creditors' work related to the First RFS

19   Motion, the Second RFS Motion and the Real Property Abandonment Notice did not provide a

20   benefit the estate; the Residence has been abandoned.

21        Creditors' opposition to the Second No Asset Notice, and the Court's ruling at the related

22   hearing, did prompt the Trustee to demand turnover of funds from Ms. Gilman.  Following

23   Creditors' filing of an objection to Ms. Gilman's proof of claim, for allowance of an

24   administrative expense in the amount of $16,323.09, Ms. Gilman did withdraw that proof of

25   claim; Ms. Gilman also paid $53,794.46 to the Trustee.  However, Creditors have not

26   demonstrated that any of those funds will be available for distribution on prepetition claims;

27   instead, given the necessary payment of compensation to the Trustee and payment of allowed

28

fees and expenses of her professionals, allowing the requested fees of Creditors' counsel, as an

administrative expense, will ensure an administratively insolvent estate.

Finally, the services of Creditors' counsel regarding the preparation and prosecution of

the Section 503(b) Motion was not an actual and necessary cost of preserving the estate.

Creditors' efforts to prioritize payment of fees to their counsel, ahead of the payment of

nonpriority unsecured claims, does not provide a benefit to other creditors. **[FN 10]**.

**B.      Creditors Have Not Made a Substantial Contribution**

Creditors request an award of administrative expenses which would ensure that no funds

will be available for distribution to unsecured creditors of Debtor's bankruptcy estate.  Before a

distribution to unsecured creditors can be made, the funds recovered from Ms. Gilman must be

used to pay the Trustee's statutory compensation and the allowed fees and expenses incurred by

the Trustee's professionals. *See Machevsky*, 637 B.R. at 544 ("The trustee's statutory

compensation and expenses and the fees and expenses of his professionals are administrative

expense claims that must come out of the available estate funds.").

If the Trustee distributes the entire amount which Ms. Gilman paid to the Trustee, i.e.,

$53,794.46, the Trustee's statutory fee under 11 U.S.C. § 326 would be approximately

$5,939.00. Approximately $47,855.00 would remain to pay the fees and expenses of estate

professionals and other administrative expenses.  Regarding that amount, over Creditors'

objection, the Court already has authorized the Trustee's payment of a flat fee of $1,000.00 to a

tax preparer. Consequently, granting the Section 503(b) Motion would create an administratively

insolvent estate.

It is noteworthy that Creditors' opposition to the Trustee's administration of the estate

has contributed to its administrative insolvency. Any monetary benefits from Creditors'

objections to the Second No Asset Notice and to the administrative expense claim asserted by

Ms. Gilman are offset by the administrative expenses incurred by the estate, as a result of

Creditors' unsuccessful litigation with the Trustee.  For example, although Creditors demanded

that the Trustee take action to administer the estate, Creditors opposed the Trustee's application

to employ bankruptcy counsel, i.e., LNBY&B.  Creditors' opposition required the setting of a

hearing and led to the filing of a reply by the Trustee, as well as the Trustee's appearance at the hearing [doc. 771].  After that hearing, the Court granted the LNBY&B Application.

Similarly, Creditors unsuccessfully objected to the Trustee's motion to employ and pay a $1,000.00 flat fee to a tax preparer [docs. 882 and 883].  Among other things, Creditors contended that paying more than $450.00 to the tax preparer was inappropriate.  Creditors' objection to the Trustee paying $550.00 more for this service than Creditors supported required the setting of a hearing, the filing of a response by the Trustee and the appearance of the Trustee's bankruptcy counsel at the hearing.

Creditors also opposed the Trustee's proposed abandonment of Debtor's alleged malpractice claims and of Debtor's interests in overencumbered real properties [doc. 824]. Creditors' opposition resulted in hearings having to be set regarding the propriety of abandonment, appearances by the Trustee at the hearings and the Trustee's filing of reply papers [docs. 811 and 812].  After the hearings, the Court overruled Creditors' opposition.  This litigation increased administrative expenses to the estate.

In light of the Trustee's statutory compensation, fees arising from services provided by her bankruptcy counsel and the tax preparer and other administrative expenses of the estate, Creditors have not demonstrated that any of the funds which Ms. Gilman paid to the Trustee, after Creditors objected to the Second No Asset Notice and to Ms. Gilman's requested allowance of administrative expenses, will be distributed for the payment of prepetition claims.  Moreover, none of Creditors' counsel's other efforts, such as Creditors' extensive litigation to disallow Debtor's $104,000.00 homestead exemption claim and Creditors' prosecution of their Section 503(b) Motion, have provided a benefit to the estate.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### III. CONCLUSION

For the reasons discussed above, the Court will deny the Section 503(b) Motion.

# # #

Date: September 30, 2022

Victoria S. Kaufman
United States Bankruptcy Judge

**FOOTNOTES**

FN 1:  As the Bankruptcy Appellate Panel for the Ninth Circuit has observed previously, "Creditors and their counsel have not acted in an economically rational manner.  They have 'spent' millions of dollars in attorney's fees attempting to preserve their rights in a judgment claim in the original amount of roughly $150,000.  That judgment claim, itself, mostly consisted of attorneys' fees.  Only $8,250 of that judgment claim consisted of actual and statutory damages.  The rest was litigation and collection costs.  The mind boggles at the inflation of this $8,250 damages award into a multimillion dollar claim based predominantly on Creditors' appetite for litigation and incurring fees." *In re Gilman*, 2019 WL 3074607, *15 (9th Cir. BAP July 12, 2019).

FN 2:  When Debtor filed his chapter 7 petition, he lived in the Residence with his then-spouse and their dependent daughter.  On the petition date, CCP § 704.730(a)(2) provided for a homestead exemption in the amount of $100,000.00 for a judgment debtor who resided in the property with at least one family member.  At that time, CCP § 704.730(a)(3)(B) provided for an enhanced homestead exemption, up to $175,000.00, for judgment debtors who were "physically or mentally disabled [and] who as a result of that disability [were] unable to engage in substantial gainful employment."  Here, in his amended Schedule C, Debtor asserted an aggregate homestead exemption, including the disability enhancement, in the amount of $104,000.00 [doc. 35].

FN 3:  After Debtor's death, Rouhel Feinstein ("Feinstein") filed a *Motion for Relief from the Automatic Stay* (the "Probate RFS Motion") [docs. 862], which was later amended [doc. 866].  Feinstein filed the Probate RFS Motion to proceed with administering Debtor's probate estate in state court.  In March 2022, because relief from the automatic stay was not required for Debtor's probate to proceed, or to appoint an executor for a probate estate, the Court denied the Probate RFS Motion as moot [doc. 872].

FN 4:  As Creditors stated in the Section 503(b) Motion, "the common fund doctrine…allows recovery from a fund created, enhanced, protected, or otherwise affected by litigation when (1) the fund redounds to the benefit of the claimant *and others* and (2) a fee assessment against the fund would spread the cost of litigation among beneficiarie*s*." [doc. 875, p. 16] (emphasis added).

FN 5:  Local Bankruptcy Rule ("LBR") 9013-1(g) states, in relevant part, "the moving party…may file and serve a reply memorandum not later than 7 days before the date designated for hearing."  "[N]ew arguments or matters raised for the first time in reply documents will not be considered."  LBR 9013-1(g)(4).

The July 2022 Supplement inappropriately contained, for the first time, a request for: (1) 12.7 hours of work regarding Creditors' objection to Ms. Gilman's request for allowance of administrative expenses; (2) 17.4 hours of work regarding the Section 503(b) Motion; and (3) 1.25 hours of work described as "Review/analyze response to trustee supplemental response."

FN 6:  As set forth in Debtor's amended Schedule C, Debtor's entire homestead exemption claim, including the disability enhancement, was $104,000.00. Creditors' litigation of Debtor's exemption claims, including their successful objection to Debtor's claim of a disability

enhancement in the amount of $4,000.00, have not caused or increased any distribution to pay prepetition claims.

FN 7:  Section 503(b)(3)(D) and (4) refer to allowing administrative expenses in making a substantial contribution in a case under chapter 9 and 11. Some courts have held that administrative expenses *also* may be allowed for making a substantial contribution in a case under chapter 7; other courts have held to the contrary.  *See Connolly*, 802 F.3d at 819 ("§ 503(b)(3)(D) of the Bankruptcy Code does not divest bankruptcy courts of authority to allow reimbursement under § 503(b) of reasonable administrative expenses of creditors whose efforts substantially benefit the bankruptcy estate and its creditors in a Chapter 7 proceeding."); *Maqsoudi*, 566 B.R. at 45 ("In a situation, such as here, where a creditor has made a substantial contribution to a Chapter 7 case, the [b]ankruptcy [c]ourt has discretion to allow an administrative expense in accordance with the equities of the case."); *contra Machevsky*, 637 B.R. at 537 (holding that "substantial contribution claims are not allowable in Chapter 7 cases."); *In re Dorado Marine, Inc*., 332 B.R. 637, 640 (Bankr. M.D. Fla. 2005) ("The plain language of the statute provides for payment of expenses incurred in contributing to a case 'under chapter 9 or 11 of this title.'").  As noted by one bankruptcy court, "the caselaw is divided on the issue, and there is no controlling case law in the Ninth Circuit at this time." *Machevsky*, 637 B.R. at 529.

FN 8:  *In re Cook Inlet Energy, LLC*, 577 B.R. 313 (Bankr. D. Alaska 2017), cited by Creditors, demonstrates the burden on the claimant, under § 503(b)(1)(A), to establish the value of that claimant's alleged contribution to the bankruptcy estate.  In *Cook Inlet Energy*, because he continued to serve as a chapter 11 debtor's executive chairman, an individual sought allowance of an administrative expense claim in the sum of $252,657.53.  *Id*. at 315.  Under the confirmed chapter 11 plan, the executive chairman's employment contract was rejected.  The executive chairman calculated his demand for an award of administrative expenses by "prorating his contractual annual salary rate of $795,000 from the date the petition was filed to the date of plan confirmation, a period of roughly four months."  *Id*. at 327.  The bankruptcy court held that the officer, who had the burden of proof, did not establish that $252,657.53 was a "reasonable value" for his postpetition services.  *Id*.  Consequently, for those services as an officer of the debtor, the court awarded him an administrative expense claim in the amount of $15,000.00.  *Id*.

FN 9:  With respect to the transaction requirement, a chapter 7 trustee takes the place of a debtor in possession in a chapter 11 case.  *See Nichols*, 2010 WL 6259965, at *5-6.

FN 10:  Creditors assert that the general language of § 503(b) supports awarding them an administrative claim, because "expenses not specifically listed in [§ 503] can be deemed administrative expenses," and they are entitled to recovery even if their actions did not result in a substantial contribution because they were "of an 'administrative nature'" [docs. 875 and 884].  This position conflicts with the standards established in the Ninth Circuit for a creditor to be awarded administrative expenses.  *See Cellular 101*, 377 F.3d at 1096 ("[T]wo things are required to recover on a § 503(b) administrative claim. First, the claimant must be a creditor of the estate. Second, the creditor must have made a 'substantial contribution' to the bankruptcy plan."); *DAK Indus.*, 66 F.3d at 1094 ("The claimant must show that the debt asserted to be an administrative expense…directly and substantially benefitted the estate."); *Dant & Russell*, 853

F.2d at 706 ("Any claim for administrative expenses and costs must be the actual and necessary costs of preserving the estate for the benefit of its creditors.").